IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 07-53439 |
| GREEN AGGREGATES, INC., | § | |
| | § | CHAPTER 11 |
| DEBTORS. | § | |

## DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING, (II) GRANTING SECURITY INTERESTS AND ACCORDING SUPERPRIORITY ADMINISTRATIVE CLAIM STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, AND (IV) AND SCHEDULING FINAL HEARING

Green Aggregates, Inc. ("Green"), Debtor-in-Possession in the above-referenced Chapter 11 case, moves this Court pursuant to §§ 105(a), 361, 362, 363, 364, 507, and 1146 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 4001, for entry of interim and final orders in substantially the form attached hereto as Exhibit A (I) authorizing the Debtor to obtain post-petition financial and granting security interests as provided herein on a secured and super-priority basis, (II) authorizing the Debtor's use of cash collateral as that term is defined in § 363 of the Bankruptcy Code (the "Cash Collateral"), (III) providing adequate protection under §§ 361 and 363 of the Bankruptcy Code, and (IV) approving the form of notice of and scheduling of a final hearing pursuant to Bankruptcy Rule 4001.

## Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## Factual Background

### A. The Bankruptcy Case.

2. On December 31, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (as amended, the "Bankruptcy Code"). The Debtor continues to operate its business and manage its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3. No trustee or examiner has been appointed in this case, nor has an official committee of unsecured creditors been established.

### B. The Debtor's Property and Assets.

4. The Debtor's principal assets consist of: (a) inventory, (b) equipment, (c) leased and owned realty, and (d) receivables.

### C. Secured Indebtedness.

5. In April 2007, Green entered into a financing program (the "Presidential Loan") with Presidential Financial Corp. ("Presidential) to fund working capital. This program is a revolving, open-ended line of credit in the maximum amount of $900,000, at the prime interest rate plus one and one half percent (1.5%). The Presidential Loan is memorialized in certain loan documents, including but not limited to, a Loan and Security Agreement dated April 24, 2007 (together with all related loan documents, the "Loan Agreement"). The Presidential Loan is

secured primarily by accounts receivable and inventory, but it is also secured by "fixed assets," equipment, fixtures, and proceeds.

6. The Debtor and Presidential propose to enter post-petition financing, as set out in the provisions of this Motion and the proposed attached order (the "Interim Order") so as to continue this financing arrangement post-petition as a Debtor-in-Possession financing agreement (the "DIP Financing"). Unless modified by this Motion and the Interim Order, the terms of the Loan Agreement shall govern.

7. As of the Petition Date, the Presidential, the proposed DIP Lender, is owed (a) $663,050.71 plus accrued and unpaid interest, fees and other charges (the "Pre-Petition Debt"), which is secured by a first lien on all of the Debtor's inventory and receivables and liens on other assets. The Debtor's equipment is generally subject to first lien held by third parties.

8. The Debtor asserts that the terms of the DIP Financing are as favorable or more favorable than those terms available from other lenders. The Debtor has contacted a number of potential lenders and none has proposed terms as favorable as Presidential. All propose higher interest rates, fee structures, and up-front charges.

9. Further, Presidential's pre-petition liens, basic loan documents, and the like are already in place. No expenses will be incurred in negotiating documents, and general terms.

C. **Events Leading Up to the Chapter 11 Filings**.

10. The Debtor's primary real estate asset, 167 acres in Dallas County, Texas, is posted for foreclosure. This land is raw land. The debt is $1 million and the value is $2 million.

D. **The Debtor's Negotiations to Acquire Post-Petition Financing**.

11. An immediate need exists for the Debtor to obtain funds and financial accommodations with which to continue operations, meet payroll and other necessary, ordinary

{L & B 10762/0002/L0250250.DOC}

3

course business expenditures, acquire goods and services, administer and preserve the estate, and maintain adequate cash balances customary and necessary for companies of this size in this industry and to maintain customer confidence. The ability of the Debtor to finance operations requires the availability of some working capital, the absence of which would immediately and irreparably harm the Debtor, its estate, and the creditors. The Debtor needs working capital to preserve the confidences of vendors, suppliers, and customers and to preserve the going concern value of the business.

12. The Debtors are certainly unable to obtain financing in the form of unsecured credit allowable solely as an administrative expense under § 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a "superpriority" administrative claim status under § 364(c)(1), particularly since the pre-petition liens of Presidential certainly make such a loan very risky.

13. As part of the Debtor's analysis in considering a chapter 11 alternative, the Debtor determined that it would require post-petition financing in the same amount and on the same basic terms as the Presidential arrangement. Given the Debtor's financial condition and capital structure, the Debtor knew that it could not obtain unsecured post-petition financing allowable solely as an administrative expense under § 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a "superpriority" administrative claim status under § 364(c)(1). There are not sufficient (if any) unencumbered assets and no new lender would likely accept a subordinated lien on the encumbered assets. Of course, the Presidential debt and lien constitute a first lien on the assets which would be the assets which a new lender would use as collateral. The Debtor approached severable reputable lenders concerning the need for post-petition financing, but no third party lender indicated a willingness to lend money to the Debtor on an

unsecured basis or on a priority lien basis. Presidential was and is the logical and only choice available to the Debtor for obtaining post-petition financing.

14. The Debtor's decision to obtain the post-petition financing and enter into the DIP arrangement as set out in the propose order is a result of the exercise of sound and reasonable business judgment. The proposed financing is necessary, essential, and appropriate for the continued operations of the Debtor's businesses and preservation of the bankruptcy estates. Given the circumstances of this case and of the Debtor and DIP Lender, the terms of the DIP arrangement and related transactions are fair, reasonable, and adequate and the proposed financing is in the best interest of Debtor's estate. The terms were negotiated at arms' length and in good faith. No better offers, commitments or timely proposals were available to the Debtor, and the Debtor reasonably believes that no alternative financing is available on any other basis. Accordingly, the Debtor should be authorized to obtain credit under § 364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code.

## The Proposed DIP Credit Facility

15. The Debtor and the DIP Lender have reached an agreement on the terms and conditions of a post-petition debtor-in-possession financing agreement under the same terms and conditions as the documents executed in April of 2007 as modified by the proposed Interim Order (the "DIP Credit Facility"). The modification to the terms and conditions of the original loan are embodied in the proposed order.

16. The proposed modifications are:

    a. **Amount of Revolving Credit Available Loan**: $900,000, of which the $663,050.71 has been drawn pre-petition, subject to the availability requirements set forth in the Loan Agreement.

b.  **Term of the DIP Loan**: The period from the date of the entry of the attached order to the earliest to occur of (i) the entry of a final non-appealable order authorizing the Debtor to sell substantially all of its assets; (ii) one hundred eighty days after the date of the commencement of the Borrower's Chapter 11 bankruptcy; (iii) the date of the occurrence of an Event of Default under the original documents or applicable under the proposed order; or (iv) the date the Debtor pays the DIP Lender in full and terminates the DIP Facility (such earliest date, the "Termination Date").

c.  **Interest Rate**: Interest on the DIP Loan shall be payable in monthly arrears at a rate of Prime plus 2%. (An increase of ½% over the interest rate currently in effect.)

d.  **Fees**: Origination Fee of $3,000, and payment of reasonable legal fees and expenses in connection with the DIP Facility and in connection with the enforcement or protection of any of Lender's rights and remedies under the DIP Facility document. Other fees chargeable under the Loan Agreement shall also be paid by the Debtor.

e.  **Security Interest/Priority**: The DIP Loan shall have superpriority administrative expense status having priority over any and all administrative expenses of the kinds specified in, or arising or ordered under, §§ 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code, except the Carve-Out Expenses (as defined below) and be secured (subject only to prior liens) (a) under section 364(c)(2) of the Bankruptcy Code, by first priority, perfected security interests and liens in and on all of the property, assets, or interests in property or assets of each Debtor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of such Debtor's "estate" (within the meaning of the Bankruptcy Code), inventory, accounts receivable, other rights to payment whether arising before or after the Filing Date, contracts, properties, Hydrocarbon Leases, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other Intellectual Property, Capital Stock and partnership interests of Subsidiaries, trademarks, trade names, all deposit accounts, all cash maintained in deposit and other accounts, all commercial tort claims, all cash and non-cash proceeds, rents, products and profits of any of the foregoing (all of the foregoing, collectively, the "Post-Petition Collateral"), subject and subordinate only to the Carve-Out Expenses (as set out below), and (b) under § 364(c)(3) of the Bankruptcy Code, by a perfected junior lien on and security interests in all of the applicable Debtor's currently owned and after acquired property that is subject to any prior liens.

f.  **Carve-Out Expenses**: The DIP Lien and the superpriority claims shall be subject t: (i) amounts payable to fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or the Clerk of the Bankruptcy Court in an amount not to exceed 115% of the monthly budgeted disbursements for the budgeted line item titled "US Trustee Fees" in the Budget, (ii) allowed fees and expenses of professionals for the Debtor in an amount not to exceed the $7,500 per month budgeted disbursements for the budgeted line items titled "Debtor's Counsel" in the Budget, incurred or accrued prior to the Termination Date.

g.  **Use of Cash Collateral**: Prior to entry of a final order, cash collateral shall be used to satisfy Pre-Petition Debt to the extent such cash collateral represents proceeds of pre-petition collateral, and post-petition debt to the extent such cash collateral represents proceeds of post-petition collateral, with any excess in each case being applied against the other. Subject to entry of a final order, all Pre-Petition Debt shall become post petition debt so as to enable efficient application of the Debtor's borrowing base.

h.  **Right to Foreclose or Cause § 363 Sale**: Upon the happening of events of default, Lender is entitled to foreclosure its DIP Liens or direct the Debtor to consummate a Bankruptcy Code § 363 sale. Debtor shall have 120 days from the date of notice of default under foreclosure or sale unless the default is curable and is cured within 10 days.

i.  **Right to Credit Bid**: Lender shall have the right to credit bid its outstanding debt under the DIP Loan at any § 363 sale of the Debtor's assets.

j.  **Events of Default and Remedies**: As is usual and customary for facilities of this nature, unless waived in writing or cured, defaults, include the following:

- failure of the Bankruptcy Court to enter the Interim DIP Order on or before 10 days after date of filing;

- failure of the Bankruptcy Court to enter a Final DIP Order acceptable to the DIP Lender in its sole discretion within 30 days of the date of filing;

- failure of the Borrower to file or cause to be filed a Plan of Reorganization within one hundred eighty days of the Date of Filing;

- dismissal of the Chapter 11 Case with respect to the Borrower or conversion of the Chapter 11 Case to a Chapter 7 case or all of the assets of the Borrower;

- failure of the Borrower to have the exclusive right to file a plan in the Chapter 11 Case;

- appointment of a chapter 11 trustee or examiner with expanded powers or other person with expanded powers in the Chapter 11 Case;

- granting of relief from the automatic stay to permit foreclosure on any material asset of the Borrower;

- reversal, vacation or stay of the effectiveness of either the Interim DIP Order or the Final DIP Order;

- failure of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects;

- failure of Debtor to pay all trade payables on a current and timely basis, and not more than 30 days after the date of invoice;

- Debtor shall maintain the properties that are collateral for the DIP Loan in proper operating order in accordance with good practice;

k. **Foreclosure in Event of Default**: In the event of default and after 10 days notice and opportunity to cure, the stay imposed by 11 U.S.C. §362 shall lift and the Lender shall have the right to exercise its non-bankruptcy law rights, including the right of foreclosure, without any further recourse to the Bankruptcy Court.

l. **Waiver of Surcharge**: Subject to entry of a final order, no cost or expense shall be charged against the Presidential's collateral under 506(c) of the Bankruptcy Code.

m. **Review Period**: The Debtor has reviewed and verified the liens and claims of Presidential and therefore has waived any challenge of those liens and claims. All other parties shall have until February 15, 2008 to review Presidential's liens and claims.

## Relief Requested

17. Debtor seeks, among other things, authority to enter into the DIP Loan. Debtor requests that the Court enter interim and final orders pursuant to Bankruptcy Code §§ 105(a), 361, 362, 363, 364, 507, an 1146 (the "Interim Order" and "Final Order," collectively the "Financing Orders"):

   a. authorizing the Debtors to (a) obtain post-petition financing from the DIP Lender up to the maximum availability under the original loan arrangement in the form of revolving advances pursuant to the DIP Credit Agreement (of which $50,000 shall be available under the Interim Order on an interim basis) and (b) grant the DIP Lender security interests in the DIP Collateral pursuant to 11 U.S.C. § 364(c)(2) and (3) and superpriority administrative claims pursuant to 11 U.S.C. §364(c)(1);

   b. authorizing the Debtor's use of the cash collateral of the DIP Lender;

   c. modifying the automatic stay, for cause under 11 U.S.C. § 362(d)(1), to the extent necessary for the DIP Lender to effectuate the terms of the DIP Credit Documents, and for the DIP Lender to enforce its rights thereunder; and

   d. scheduling a final hearing pursuant to Bankruptcy Rule 4001(c)(2) no earlier than 15 days after service of the Motion, but no later than 30 days after the Petition Date, at which the Debtor will seek entry of a Final Order authorizing and approving the balance of the DIP Credit Facility;

The requested relief is necessary for Debtor to meet its post-petition working capital needs and to preserve the value of its bankruptcy estate for the benefit of creditors.

## Taxes

18. Pursuant to § 1146(c) of the Bankruptcy Code, the pledging of any collateral, or the delivery of any security interests or other instruments of transfer, the furnishing of any promissory note(s) or other evidence of indebtedness, in furtherance of, or in connection with the DIP Credit Facility or the DIP Credit Documents, including (i) any mortgages, security agreements, collateral assignments, or other similar agreements, or (ii) evidence or documents of

perfection (including transfers of assets to and by DIP Lender in connection with enforcement of the Financing Orders) should not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. *See generally, In re T.H. Orlando Ltd.*, 391 F.3d 1287 (11th Cir. 2004) (broad interpretation of § 1146(c).

## Law and Argument

A. **The DIP Credit Facility Satisfies the Standards of Bankruptcy Code Section 364.**

19. The Debtors are unable to procure credit required to fund their post-petition business operations in the form of unsecured credit or unsecured credit with an administrative expense priority under the Bankruptcy Code § 503(b)(1).

20. The Debtor, therefore, had no choice but to seek credit on a secured basis. The procurement of post-petition credit by a debtor-in-possession is governed by Bankruptcy Code § 364. In relevant part, that section provides:

> (c) if the [debtor-in-possession] is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of a credit or incurring of debt –
>
> (1) with priority over any or all administrative expenses of the kid specified in Section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

21. A debtor seeking financing under Bankruptcy Code § 364(c) must make a reasonable effort to seek other sources of unsecured credit available but "is not required to seek credit from every possible source," and is granted considerable deference in acting in accordance with its business judgment. *In re Bray v. Shenandoah Fed. Sav. & Loan Ass'n (in re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986); *In re Ames Department Store, Inc.*, 115 B.R. 34 (S.D.N.Y.

1990). The Debtor does not have any other financing source to fund the amounts needed to sustain its business during the Chapter 11 case. The DIP Lender provided the Debtor with enough credit availability. Because of its financial conditions and its capital structure, the Debtor reasonably believes that it could not have obtained such financing on more favorable terms than those offered by the DIP Lender. Because the Debtor has a need for the financing offered by the DIP Lender to meet its ongoing working capital needs and to preserve and enhance it going concern value, the Debtor has satisfied its burden of showing the unavailability of alternative unsecured financing.

22. Having determined that post-petition financing was available only under Bankruptcy Code § 364(c), the Debtor negotiated the DIP Credit Facility at arms' length and in accordance with their sound business judgment. In negotiating debtor-in-possession financing arrangements, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties." *Id.* at 38. Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., In re Snow Shoe*, 789 F.2d 1085 (4th Cir. 1986) (approving post-petition financing necessary to sustain seasonable business); *Ames*, 115 B.R. at 40 ("Cases consistently reflect that the court's discretion under § 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"). Courts generally will not override the debtor's prudent and responsible exercise of its business judgment consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package.

*See In re Simasko Prod. Co.*, 47 B.R. 444 (Bankr. D. Colo. 1985) (noting that business judgment should be left to the boardroom and not to the bankruptcy courts).

23. The financing contemplated by the DIP Credit Facility benefits the Debtor's bankruptcy estate and their creditors. It is critical to the preservation and enhancement the Debtor's businesses and going concern value. With the credit provided under the DIP Credit Facility, the Debtor will be able to obtain services in connection with their operations, including paying its employees, maintaining adequate cash balances, and operating its business in order to preserve the ongoing value of its assets and enterprise for the benefit of all creditor pending the anticipated asset sales during the bankruptcy. The availability of credit under the DIP Credit Facility will provide Debtor's vendors and suppliers the necessary confidence to continue or resume ongoing relationships with Debtor, including the extension of credit terms for the payment of services. Accordingly, this Court should authorize the Debtor to obtain post-petition financing to the extent and pursuant to the extent and pursuant to the terms contained in the DIP Credit Documents and the proposed final financing order.

24. The terms and conditions of the DIP Credit Facility and related DIP Credit Documents are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Accordingly, the DIP Lender should be accorded the benefits of § 364(e) of the Bankruptcy Code in respect of the Post-Petition Financing.

C. **The Court May Permit the Debtors to Use Their Pre-Petition Cash Collateral**

25. The Debtor's use of property of its estate is governed by § 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section ...1108...of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lese of property of the estate, in the ordinary course of business, without

notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

26. A debtor in possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with § 363 of the Bankruptcy Code. *See* 11 U.S.C. § 1107(a).

27. Section 363(c)(2) of the Bankruptcy Code establishes a special requirement with respect to "cash collateral," by providing that the trustee or debtor in possession may not use, sell or lese "cash collateral" under subsection (c)(1) unless:

    a.    each entity that has an interest in such collateral consents; or

    b.    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

"Cash collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

28. Here, the party having a lien on cash collateral has consented to such use in accordance with terms of the DIP Credit Documents, subject to the terms and conditions set forth in this Motion and thus such use is authorized under § 363(c)(2).

29. The Debtor stipulates that all of the liens of Presidential are valid and that Presidential has receive no preferential payments or fraudulent conveyances and that Presidential is subject to none of the "strong arm powers" of 11 US.C. §542-53.

30. Any creditor or committee appointed in this case shall have until February 15, 2008 to review all pre-petition transactions with Presidential. After that date, successor-in-interest, including, but not limited to, any Chapter 11 or Chapter 7 trustee.

## Conclusion

31. Based upon the foregoing, the Court should enter the Financing Orders (a) granting the Debtors the authority to enter into the DIP Credit Facility and grant security interests thereunder and approving all of the terms and conditions of the DIP Credit Facility and DIP Credit Documents, (b) authorizing the Debtor's use of Cash Collateral, (c) modifying the automatic stay, (d) scheduling a final hearing, and (e) granting the Debtor such other legal and equitable relief to which it is entitled.

DATED: 1/2/08

Respectfully submitted,

**LANGLEY & BANACK, INC.**
Trinity Plaza II - Ninth Floor
745 East Mulberry
San Antonio, Texas 78212-3166
(210) 736-6600
(210) 735-6889 - Telecopier

By:_____
WILLIAM R. DAVIS, JR.
State Bar No. 05565500
R. GLEN AYERS, JR.
State Bar No. 01467500

**Attorneys for Green Aggregates, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of January, 2008, the foregoing **Emergency Motion for Interim and Final Orders** was served by the U.S. first class mail, postage prepaid, on the parties listed on the Service List attached hereto. Copies were also served on Presidential's counsel, Brent McIlwain, by e-mail, and the U.S. Trustee by hand-delivery.

R. GLEN AYERS, JR.

Crean Aggregates
Weekly Budget — JANUARY 2008

| | Week 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Sales | 70,000 | 70,000 | 70,000 | 70,000 |
| Rent | 10,000 | 0 | 0 | 0 |
| Payroll | 25,000 | 25,000 | 25,000 | 25,000 |
| Burden | 4,000 | 4,000 | 4,000 | 4,000 |
| Fuel | 11,000 | 11,000 | 18,000 | 11,000 |
| Repairs | 6,000 | 6,000 | 6,000 | 6,000 |
| DulloB | 15,000 | 0 | 0 | 15,000 |
| Rent+R | 0 | 0 | 0 | 25,000 |
| Other | 1250 | 1250 | 1250 | 1,250 |
| INS | 0 | 0 | 12,000 | 0 |
| Gasoline | 2000 | 2000 | 2000 | 2000 |
| FMCC | 1300 | 1300 | 1300 | 1300 |
| BOTO | 0 | 0 | 4700 | 0 |
| Peoples | 0 | 0 | 0 | 4800 |
| J Deere | 5500 | 0 | 0 | 0 |
| Paints | 6000 | 0 | 0 | 0 |
| | ~~~~~~ 2950 | ~~~~~~ 19,450 | ~~~~~~ 4250 | ~~~~~~ −25,350 |

"Holdback" + Fees for Presidential
Not included in cash flow
of ~~~~~~ 1300.00

EXHIBIT A

2008
## February

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Sales | 85,000 | 85,000 | 85,000 | 85,000 |
| Rent | 10,000 | 0 | 0 | 0 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 |
| Broker | 4,500 | 4,500 | 4,500 | 4,500 |
| Fuel | 15,000 | 15,000 | 20,000 | 13,000 |
| Repairs | 7,000 | 7,000 | 7,000 | 7,000 |
| Bill+R | 0 | 17,000 | 0 | 0 |
| Rent+R | 0 | 0 | 0 | 30,000 |
| Other | 1250 | 1250 | 1250 | 1250 |
| Gasolio | 2000 | 2000 | 2000 | 2000 |
| FMCC | 1300 | 1300 | 1300 | 1300 |
| BOTO | 0 | 0 | 4700 | 0 |
| Peoples | 0 | 0 | 0 | 4800 |
| J Deere | 5500 | 0 | 0 | 0 |
| | $28,450 | $6950 | $12,250 | $-9550 |

38,100 net w/o hold back o fees

2008
March

|  | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Sales | 100,000 | 100,000 | 100,000 | 100,000 |
| Rent | 10,000 | 0 | 0 | 0 |
| Payroll | 35,000 | 35,000 | 35,000 | 35,000 |
| Burden | 6000 | 6,000 | 6,000 | 6,000 |
| Fuel | 13000 | 13,000 | 20,000 | 13,000 |
| Repairs | 6000 | 6000 | 6,000 | 6,000 |
| Drill & B | 20000 | 0 | 0 | 20,000 |
| Rent & R | 0 | 0 | 0 | 25,000 |
| Other | 1250 | 1250 | 1250 | 1250 |
| Ins. | 0 | 0 | 12,000 | 0 |
| Gasoline | 2000 | 2000 | 2000 | 2000 |
| FMCC | 1300 | 1300 | 1300 | 1300 |
| BOTO | 0 | 0 | 4700 | 0 |
| Peoples | 0 | 0 | 0 | 4800 |
| J Deere | 5500 | 0 | 0 | 0 |
|  | 19,950 | 35,450 | 11,750 | 14,350 |

81500 Net cash flow
Less:
- 15000 Electrostatic (Capital project)
- 6500 Haul truck (down p'mt or rent)
- 10,000 Misc. repairs to equipment money

35,650 No hotel bank or fees